## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAMIEN PIERCE,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 19-4073** |
| **PECO ENERGY COMPANY,** | : | |
| *Defendant* | : | |

### MEMORANDUM

PRATTER, J.                                                    SEPTEMBER 27, 2021

Damien Pierce contends that his employer, PECO Energy Company, discriminated against him based on his race and perceived disability by imposing upon him burdensome certification requirements related to sleep apnea. PECO moved for summary judgment on both the race the and disability discrimination claims. The Court will grant the Motion.

### BACKGROUND

Damien Pierce, an African-American man, is currently a PECO Operations Foreman and was previously a PECO Senior Distribution Mechanic ("SDM"). During his time as an SDM, Mr. Pierce was required to maintain his Commercial Driver's License ("CDL") under state and federal law. In order to obtain a CDL, an applicant must submit a medical certification from a medical examiner who has been certified by the Federal Motor Carrier Safety Administration ("FMCSA"). PECO policy requires all employees who require such a certification to obtain it through PECO's Occupational Health Services (OHS) Department. Barbara Guenst is a nurse practitioner in PECO's OHS Department who is also a Department of Transportation ("DOT") certified medical examiner.

Mr. Pierce's first medical exam with Ms. Guenst took place in August 2017. Before then, Mr. Pierce had filled out a DOT Medical Form in 2017, but he failed to disclose high blood

1

pressure, past neck and back problems, past muscle problems, a prior sleep test, a hospital stay fewer than five months earlier, and use of illegal anabolic steroids within the past two years. During the exam, Ms. Guenst determined that Mr. Pierce presented several risk factors for sleep apnea, including a BMI over 45, a body weight of 314 pounds, a high Mallampati Classification score (small airway), a neck circumference of 21 inches, an age of 42 years or older, hypertension, and being male.   Guidance published by the Medical Review Board on Commercial Motor Vehicles recommends that medical examiners require obstructive sleep diagnostic testing when an applicant presents either 1) a BMI greater than 40, or 2) a BMI between 33 and 40 combined with three factors from a list that includes hypertension, a high Mallampati Classification score, age 42 or above, and being male.

Mr. Pierce alleges that Ms. Guenst told him that he was more prone to sleep apnea because of his race and that if it were up to her "half you guys wouldn't work here." Doc. No. 38, Resp. ¶ 22. Mr. Pierce also alleges that he asked Ms. Guenst if by "you guys" she meant "Black guys," but she did not respond and instead, according to him, "smirked and put her head down." Id. Ms. Guenst told Mr. Pierce that he would need to obtain a sleep study and follow-up with the OHS Department regarding his high-blood pressure.  Ms. Guenst then issued Mr. Pierce a one-year medical certification, which was the longest she could issue to someone with a hypertension diagnosis pursuant to DOT regulations.

In April 2018, Mr. Pierce provided an at-home sleep study report to PECO OHS, which reflected a mild sleep apnea condition.  At his next appointment with Ms. Guenst to renew his DOT medical certification in August 2018, Ms. Guenst informed Mr. Pierce that his at-home sleep apnea study was insufficient because there was no "chain of custody."[1] Doc. No. 31 ¶¶ 29, 31.

---

[1] Mr. Pierce asserts that a "chain of custody" refers to "some sort of documentation that the patient had actually taken the test, as opposed to someone else." Doc. No. 38 Resp. ¶ 21(b).

Mr. Pierce alleges that Ms. Guenst challenged him, yelled at him, and again repeated the same exchange "about us guys not working there" and not answering Mr. Pierce's question about whether she meant "Black guys." Doc. No. 38 Resp. ¶ 31. At his 2018 appointment, Mr. Pierce presented the same sleep apnea risk factors as his 2017 evaluation. Ms. Guenst issued Mr. Pierce a three-month DOT medical certification and advised him to get in-lab sleep apnea test during that time.

Mr. Pierce objected to Ms. Guenst requiring an in-lab sleep study because he believed he had complied with the sleep study requirement through the at-home sleep study, and he made an internal complaint against Ms. Guenst through a PECO hotline immediately after his August 2018 appointment with her. Then, in November 2018, Mr. Pierce obtained a DOT medical certification from Concentra Occupational Health, a third-party medical evaluation company. However, Mr. Pierce admits that PECO does not accept outside certifications for purposes of issuing CDL certifications.

On November 15, 2018—one day prior to expiration of the 3-month certification—Mr. Pierce contacted PECO OHS to tell them that he had been unable to schedule his in-lab sleep apnea study until February 2019 and to request another extension of his medical certification. Mr. Pierce was not given another extension and his CDL certification status with PECO expired. As a result, Mr. Pierce was no longer able to operate a commercial motor vehicle for PECO, although he was able to continue working during regularly scheduled shifts.

Ms. Guenst helped Mr. Pierce obtain an in-lab sleep study through his insurance, and a study was conducted in December 2018. Mr. Pierce alleges that Ms. Guenst told the sleep center that Mr. Pierce had been "uncooperative" and was "resistant to using CPAP" to treat sleep apnea. *Id.* Resp. ¶ 46. Mr. Pierce also alleges that Ms. Guenst contacted his supervisors and had him

3

removed from the overtime "Call Out" list. *Id.* Resp. ¶¶ 3, 42. The in-lab sleep study results showed that Mr. Pierce had severe sleep apnea that required treatment with a continuous positive airway pressure (CPAP) machine. Mr. Pierce provided the in-lab test results to PECO in January 2019, and Ms. Guenst informed Mr. Pierce that he would need to provide data from a 30-day period demonstrating that he was wearing his CPAP machine at night. Mr. Pierce submitted his data to Ms. Guenst in March 2019 and a few days later Ms. Guenst issued a one-year DOT medical certification to him.

Mr. Pierce alleges that because of his race Ms. Guesnt required him to undergo tests for sleep apnea and then refused to accept the results of the tests, which caused PECO to deem Mr. Pierce's CDL non-compliant and affected his ability to earn overtime pay. Mr. Pierce filed a complaint pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), as amended by the Americans with Disabilities Amendments Act of 2008 ("ADAA"), and the Pennsylvania Human Relations Act, 43 Pa. C.S. §§ 951, *et seq.* ("PHRA").[2]

## LEGAL STANDARDS

A court can grant a motion for summary judgment if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

---

[2] Mr. Pierce filed a charge of discrimination with the EEOC and the Pennsylvania Human Relations Commission against PECO alleging discrimination based on race and disability on October 29, 2018.

In evaluating a motion for summary judgment, "the Court must view the facts and all reasonable inferences in the light most favorable to the non-moving party." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 384 (E.D. Pa. 2013). But "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). "Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 888–89 (E.D. Pa. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

DISCUSSION

### I.    Race Discrimination

Under Title VII, a plaintiff may prove race discrimination through either "direct evidence of [an] intent to discriminate" or through "indirect evidence from which a court could infer [an] intent to discriminate." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008). If the plaintiff does not introduce direct evidence, the Court will apply the *McDonnell Douglas* burden-shifting framework for indirect evidence. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Courts in the Third Circuit analyze claims brought under Title VII and the PHRA using the same burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (stating that "the interpretation of the PHRA is identical to that of federal anti-discrimination laws").

## A.  Direct Evidence

Direct evidence, of course, is "overt or explicit evidence which directly reflects discriminatory bias by a decision maker." *Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 665 (E.D. Pa. 2019).  However, "[p]roving discrimination by direct evidence is a 'high hurdle.'"  *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 889 (E.D. Pa. 2020) (quoting *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 587 (E.D. Pa. 2013)).  "Such evidence 'leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it' when [s]he made the challenged employment decision." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338–39 (3d Cir. 2002) (quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir.1995)).

Mr. Pierce maintains that a reasonable juror could find PECO liable through direct evidence based on Ms. Guenst's comments.  Mr. Pierce admits that Ms. Guenst's initial decision in 2017 to require him to take a sleep apnea test may or may not qualify as an adverse employment action.  But he asserts that her refusal in August 2018 to accept the results of his at-home test and her refusal to give him a third extension in November 2018 to schedule an in-lab test did constitute an adverse employment action, and was discriminatory.  He argues that Ms. Guenst's alleged comments that African-Americans were more susceptible to sleep apnea and that if it were up to her "half you guys wouldn't have a license" are direct evidence of race discrimination.  This conduct deprived Mr. Pierce of certain employment opportunities, including overtime, and damaged his reputation among his fellow workers.

PECO argues that Mr. Pierce has not provided direct evidence that PECO had an intent to discriminate against a specific race.  Regarding Ms. Guenst's comment about racial predisposition

to sleep apnea,[3] PECO argues that identifying race as a possible risk factor does not create an inference of discrimination. Rather, PECO contends that noting the correlation of certain diseases with race or ethnicity is a valid medical observation and that medical professionals frequently rely on such demographic information when assessing an individual's risk for different conditions. PECO also argues that Mr. Pierce's assumption that "you guys" referred to "African Americans" and Ms. Guenst's alleged silence when questioned about it by Mr. Pierce, is not the type of "smoking gun" direct evidence that can sustain a discrimination claim because according to Mr. Pierce himself, he, not Ms. Guenst, referred to "Black guys." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993). PECO argues that the only comment Mr. Pierce alleges that Ms. Guenst directly made involving race was in a medically-appropriate discussion of risk factors.

Even if Ms. Guenst's comments were in fact some evidence of bias, PECO argues that Mr. Pierce has not shown that Ms. Guenst relied on such alleged bias in making the adverse employment decision. After giving Mr. Pierce two extensions, PECO argues that it was not a discriminatory act for Ms. Guenst to decline the third request, given that Mr. Pierce was responsible for scheduling his own in-lab test and failed to do so. While Mr. Pierce argues that the in-lab sleep study was unnecessary after the at-home sleep study, the in-lab results did in fact show severe sleep apnea in contrast to the at-home test. Mr. Pierce also acknowledges that he did not list several health conditions on his CDL medical examination reports as he was required to do.

---

[3] Mr. Pierce and PECO dispute whether Ms. Guenst said specifically "sleep apnea" or mentioned race in the context of certain diseases more broadly, but the Court accepts at this time Mr. Pierce's version of events as the non-movant for summary judgment purposes.

Even accepting Mr. Pierce's version of events, Ms. Guest's comments do not clear the "high hurdle" of proving discrimination by direct evidence. After Ms. Guenst repeated both alleged comments at the 2018 appointment, Ms. Guenst extended Mr. Pierce's certification another 3 months to allow time for an in-lab study. She then helped Mr. Pierce obtain insurance coverage for the in-lab study. When Mr. Pierce provided the severe sleep apnea diagnosis, Ms. Guenst instructed him to submit CPAP data because he posed a safety risk with untreated severe sleep apnea. When he submitted this data as instructed, Ms. Guenst approved Mr. Pierce's certification. The events as construed in Mr. Pierce's favor do not create "a rational presumption that the person expressing bias acted on it' when [s]he made the challenged employment decision." *Fakete*, 308 F.3d at 338–39. The Court will instead turn to the burden-shifting framework for circumstantial evidence.

## B. Burden-Shifting Framework

Absent a finding of direct evidence, a plaintiff can make a prima facie showing of race discrimination based on circumstantial evidence through the *McDonnell Douglas* burden-shifting framework. A plaintiff must show that his "factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action." *Jackson v. Lehigh Valley Physicians Grp.*, No. 08-cv-3043, 2010 WL 1630737, at *12 (E.D. Pa. Apr. 20, 2010) (quoting *Coulton v. Univ. of Pa.*, No. 05-cv-1446, 2006 WL 759701, at *5 (E.D. Pa. Mar. 21, 2006), *aff'd*, 237 F. App'x 741 (3d Cir. 2007)). Then, if a prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If such a reason is given, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons were "not

its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

### 1.   Prime Facie Case

To state a prima facie case of discrimination, a plaintiff must demonstrate that: (1) he is a member of the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of intentional discrimination. *McNeil v. Greyhound Lines, Inc.*, 69 F. Supp. 3d 513, 523 (E.D. Pa. 2014), *aff'd*, 628 F. App'x 101 (3d Cir. 2015). "The evidentiary burden at this stage is rather modest: it is to demonstrate to the court . . . that discrimination *could* be a reason for the employer's action." *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996) (emphasis in original). The parties do not dispute that Mr. Pierce has met the first three prongs, but PECO contends that the circumstances surrounding Mr. Pierce's sleep apnea testing do not give rise to an inference of discrimination.

In addition to Ms. Guenst's comments, Mr. Pierce uses comparators to try to fulfill his duty to make out a prima facie case. "As an alternative to the fourth prong, a plaintiff may show 'that similarly situated individuals outside the plaintiff's class were treated more favorably than he.'" *McNeil v. Greyhound Lines, Inc.*, 69 F. Supp. 3d 513, 522 (E.D. Pa. 2014), *aff'd* 628 F. App'x 101 (3d Cir. 2015) (quoting *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273–74 (3d Cir. 2010)). "Under Title VII, for fellow employees to be considered similarly situated, they must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 WL 355617, at *11 (E.D. Pa. Feb. 6, 2008) (quoting *Anderson v. Haverford College*, 868 F. Supp. 741, 745 (E.D. Pa. 1994)). Mr. Pierce argues that

four white PECO employees were treated more favorably than him because Ms. Guenst did not require them to obtain an in-lab sleep apnea test: David Layden, D.D.,[4] David Brewer, and Jakob Cline.   PECO argues that these individuals are not similarly situated because they had "differentiating or mitigating circumstances" that distinguished their employer's treatment of them from the plaintiff. *Id.* at *11.

The Court finds that none of the four comparators offered by Mr. Pierce are similarly situated to him. Two of the four employees, Mr. Layden and Mr. Brewer, lost a significant amount of weight after prior diagnoses of sleep apnea. PECO maintains that Ms. Guenst accepted an at-home sleep study from Mr. Layden and did not require a new study from Mr. Brewer because each employee no longer presented risk factors that would require additional testing.[5]   The next comparator, Jakob Cline, had volunteered to Ms. Guenst that he had previously had a sleep apnea examination with a negative result, but did not present risk factors that would require diagnostic testing at the time of his appointment. Ms. Guenst again did not require in-lab testing because Mr. Cline did not present the risk factors that would prompt such testing. Lastly, D.D. presented at-home test results that were positive for obstructive sleep apnea, so Ms. Guenst required D.D. to start using a CPAP device. Ms. Guenst did not require in-lab testing because D.D. provided a positive at-home test result and began treatment. PECO also argues that Ms. Guenst required nine other employees in similar positions to Mr. Pierce to complete in-lab sleep studies before she

---

[4]  The Court uses only the initials for the name of one of the four employees, D.D., per the parties' agreement.

[5]  Mr. Pierce argues that Mr. Layden and Mr. Brewer still presented other risk factors such as their age and being male (along with hypertension for Mr. Layden).  However, Mr. Pierce does not argue that either employee presented a BMI that, combined with these risk factors, would trigger the need for additional testing under the Medical Review Board on Commercial Motor Vehicles guidance cited by PECO.  There is also no indication that either employee had previously misrepresented their medical information to PECO.

signed off on DOT medical certifications. Seven of these employees were white and *none* were African-American. Mr. Pierce does not dispute this information.

Lastly, Mr. Pierce argues that flaws in two in-house investigations of allegations of misconduct against Ms. Guenst present evidence of possible racial bias. First, PECO investigated the internal hotline complaint filed by Mr. Pierce after his August 2018 appointment with Ms. Guenst. Then, in February 2019, the president of Mr. Pierce's union sent a letter to PECO's Vice President of Human Relations. The letter included complaints from 49 other union employees about PECO OHS and Ms. Guenst's alleged mistreatment. PECO states that the investigation revealed several instances where Ms. Guenst could have better de-escalated interactions with employees.

Mr. Pierce argues that the investigation team interviewing Ms. Guenst failed to adequately question her about her alleged racial remarks on both occasions. Citing *Williams v. City of Phila. Off. of Fleet Mgmt.*, No. 18-cv-3875, 2020 WL 1677667, at *8 (E.D. Pa. Apr. 6, 2020), and an unpublished decision from the U.S. Court for the District of Kansas,[6] Mr. Pierce argues that an inadequate investigation can present evidence of possible racial bias. Given that most of the union members who complained about Ms. Guenst were white,[7] Mr. Pierce's characterization of the union-initiated investigation as a response to racial discrimination claims appears to be a stretch. Additionally, both cases cited by Mr. Pierce discuss investigation evidence in the context of hostile work environment and retaliation claims, where an employer's investigation was uniquely relevant

---

[6] *Nguyen v. Unified Gov't of Wyandotte Cty. / Kansas City*, No. 16-cv-2654, 2018 U.S. District LEXIS 13741, at *19 (D. Kan. 2018).

[7] Mr. Pierce argues that the union identified two of the other employees who filed complaints having suspicions (not actual claims) that Ms. Guenst's actions were related to their race.

because the employer punished the claimant rather than the offending employee.  Here, Mr. Pierce's Amended Complaint does not allege retaliation or a hostile work environment.[8]

Considering that a plaintiff's initial burden to establish a prima facie case is relatively light and Mr. Pierce's allegations about Ms. Guenst's comments must be taken as true for summary judgment purposes, the Court finds that the cumulative evidence presented by Mr. Pierce suggests that discriminatory motivation *could* be a reason for PECO's actions.  This, however, is not the end of the inquiry.

### 2.  Employer Justification and Pretext

If Mr. Pierce establishes a prima facie case of race discrimination based on Ms. Guenst's comments, the burden shifts to PECO to assert a legitimate, non-discriminatory justification for the lab testing requirements.  This burden is also "relatively light," *Fuentes*, 32 F.3d at 763, and PECO easily meets it.  PECO asserts that sleep apnea is a safety concern for employees operating large vehicles and that Mr. Pierce presented six risk factors for obstructive sleep apnea.  After Mr. Pierce's first extension, Ms. Guenst determined that there was no chain of custody for Mr. Pierce's at-home sleep study and required an in-lab version with another three-month extension.  When Ms. Guenst helped Mr. Pierce obtain insurance coverage for an in-lab sleep study and he completed the study, the results did in fact show severe sleep apnea.

Thus, the burden shifts back to Mr. Pierce to show that PECO's asserted justification for imposing sleep apnea testing requirements is mere pretext.  Mr. Pierce must present evidence such that a reasonable factfinder could either disbelieve PECO's stated legitimate reasons or believe that an "invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Williams*, 2020 WL 1677667, at *8.  The plaintiff must

---

[8] Mr. Pierce was promoted to Foreman the year after his internal complaint and submission of CPAP data.

"demonstrate weaknesses, implausibilities, inconsistences, incoherencies, or contradictions from which a reasonable juror could conclude" that PECO's "explanation is unworthy of credence, and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (internal quotation marks omitted). This is a higher hurdle than the initial burden to establish a prima facie case because "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (citations omitted).

PECO argues that Mr. Pierce's frustration with obtaining a second sleep apnea test does not mean that Ms. Guenst's use of his risk factors was mere pretext. The results of his in-lab sleep study showed that Mr. Pierce had obstructive sleep apnea and, thus, the results of his at-home test were incorrect. As discussed above, each of the comparators offered by Mr. Pierce are distinguishable because they did not present as many risk factors as Mr. Pierce. Mr. Pierce does not allege that any of the comparators previously misrepresented their medical history. Further, most of the other distribution mechanics who Ms. Guenst required to complete in-lab sleep studies were white.[9] And when Mr. Pierce submitted his CPAP data to demonstrate that he no longer posed a safety risk, Ms. Guenst issued his CDL certification.

The Court finds that Mr. Pierce has not pointed to sufficient evidence to discredit PECO's bona fide reasons for requiring him to obtain in-lab sleep apnea testing before approving his CDL

---

[9] Other distribution mechanics chose not to undergo an in-lab sleep test, but instead provided PECO with CPAP compliance data in order to obtain their DOT Medical Certification. While the parties dispute whether Mr. Pierce was given the option to use CPAP and resisted CPAP use, this dispute is not material to whether Ms. Guenst's assessment of Mr. Pierce's sleep apnea risk factors was mere pretext.

certification.   Under the *McDonnell Douglas* burden-shifting framework, Mr. Pierce's race discrimination claims do not survive summary judgment.

## II.    Disability Discrimination

Mr. Pierce also alleges that PECO's actions violated the ADA by "regarding him" as having severe sleep apnea. PECO counters it was required to comply with DOT regulations, which limit the application of the ADA. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999) ("When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law. The Senate Labor and Human Resources Committee Report on the ADA stated that 'a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability under title I of this legislation.'"). PECO argues that it is responsible for ensuring that only medically qualified drivers operate commercial vehicles and that untreated sleep apnea would disqualify a driver from DOT medical certification.

Mr. Pierce counters that PECO was discriminatory in its use of discretion in complying with DOT standards and failed to reasonably accommodate him by allowing him to use a CPAP device in lieu of in-lab testing. To the extent that Mr. Pierce objects to PECO employees besides him using CPAP devices without in-lab testing, it is unclear how this constitutes a *disability* discrimination claim, given that everyone who used a CPAP device was "regarded as" having sleep apnea. PECO also maintains that "[a]n employer is not required to provide an accommodation to an individual that poses a 'direct threat' to the safety of the employee or others," *Clark v. SEPTA*, No. 06-cv-4497, 2008 U.S. Dist. LEXIS 5466, at *19-*20 (E.D. Pa. 2008), and, further, that severe sleep apnea poses such a threat. Mr. Pierce does not dispute that severe sleep apnea poses a safety risk and that his in-lab testing showed that he had severe sleep apnea that required treatment with

a CPAP device.  Thus, the Court will also grant summary judgment for PECO on Mr. Pierce's

disability discrimination claim.

CONCLUSION

For the foregoing reasons, the Court grants PECO's motion for summary judgment on all

claims.  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE